UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In Re

                                    Case No. 3:21-bk-02197-RCT

Bizgistics, LLC,                             Chapter 11

       Debtor.

_____/

## READYCAP LENDING, LLC'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Bankruptcy Procedure 7056, ReadyCap Lending, LLC moves this Court for a summary judgment on issues related to its status as a creditor and shows the Court that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

## ISSUES BEFORE THE COURT

I.       **WHETHER READYCAP LENDING IS ENTITLED TO STATUS AS A SECURED CREDITOR**

II.      **WHETHER READYCAP WAIVED ITS RIGHT TO SEEK DISTRIBUTIONS FOR THE UNSECURED PORTION OF ITS CLAIM**

III.     **WHETHER READYCAP HAS A SECUITY INTEREST IN THE CAUSES OF ACTION**

## MOVANT'S STATEMENT OF UNDISPUTED FACTS

ReadyCap Lending LLC contends that the following facts are undisputed and can be considered by the court for summary judgment.

1. Debtors applied to ReadyCap Lending (RCL) for a loan to fund the purchase of a Federal Express last mile delivery business.

2. The loan was approved as an SBA Guaranteed Loan by an Authorization issued on December 1, 2020. The Authorization is attached as Exhibit A.

3. Bizgistics signed a Loan Agreement of December 1, 2020, in which it acknowledged that its loan was subject to the SBA Authorization. The Loan Agreement is attached as Exhibit B.

4. Bizgistics, Inc. by Darrell K. Giles, President executed the Note in the principal amount of One Million Four Hundred Eighty-four Thousand and 00/100 ($1,484.00) on December 15, 2020.

5. Section H 1 of the SBA Authorization required that the Lender must have a "First Perfected Security interest, subject to no other liens, in the following personal property (including any proceeds and products), whether now owned or later acquired, wherever located : Equipment; Inventory; Accounts; Instruments; Chatter Pper; General Intangibles…"

6. ReadyCap Lending perfected its security interest in the personal property by a UCC filing in the state of Pennsylvania where Bizgistics is incorporated which was Acknowledged on November 10, 2020.  The Acknowledgment is attached as Exhibit C.

7. The UCC filing gave ReadyCap a security interest in "[a]ll assets and property…"

8. RCL filed a Proof of Claim on January 6, 2022.

## DISCUSSION

### I.    WHETHER READYCAP IS ENTITLED TO STATUS AS A SECURED CREDITOR.

The Debtor through its motion that if filed with the Court contends that ReadyCap Lending (RCL) is not entitled to status as a secured lender in this matter. It bases this claim on the argument that RCL missed the court's deadline to file a proof of claim and therefore under Red. R. Bank. P. 3003 (c) (2) is not entitled to distribution under the plan. However, under bankruptcy law, a secured creditor is not required to file a proof of claim.

Section 501 (a) allows a creditor to file a proof of claim, but such a right is permissive only, and it does not require that a proof of claim be filed by any creditor. Bizgistics overlooks Section 506 (d) which addresses the status of a secured creditor's lien where the creditor fails to file a proof of claim:

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless…

(2) such claim is not an allowed secured claim due only to the failure of any entitle to file a proof of such claim…

RCL did in fact file a proof of claim in this matter. However, if the court disallows the secured claim, RCL is still entitled to enforce its lien on the property covered by its security interest. Section 506 (d) (2) codified the rule of *Long v. Bullard*, 117 U.S. 617, 620 (1886), which held that a secured creditor could rely on its lien and need not file a claim in bankruptcy to protect its line. *In re Thomas*, 91 B.R. 117 (Ala. N. D. 1988). See also, *In re Tarnow*, 749 F.2d 464 (7th

Cir. 1984).   The is also noted that the Notice of Bankruptcy form relates that same information to the creditors.   In Section 8, the notice reads, "Secured creditors retain right in their collateral regardless of whether they file a proof of claim…"

Further proof of the right to act as a secured creditor is that the Debtor consistently throughout the bankruptcy recognized the creditor's rights as a secured creditor.   It negotiated with the RCL to liquidate the Debtor's vehicles that were  secured by RCL's lien on the titles.   The orders approving the sale of the property specifically stated that the proceeds would be turned over to the creditor.   These orders all contained similar language that reads, "The lien of ReadCap shall attach only to those sale proceeds directly traceable the sale of the McGee Vehicles to the same extent, validity, and priority as such lien existed prior to the sale of the McGee Vehicles. Therefore, in all of its dealing with the ReadyCap secured assets, the Debtor and Court recognized ReadyCap's security interest.   To now object to the ReadyCap security claim on the property of the Debtor after it had liquidated the majority of the assets is blatantly unfair and appears to be an attempt to trap the creditor.   If Debtor was going to object to RCL's status as a secured creditor, it should have done so at all of the hearing and not lulled ReadyCap into believing that Debtor was not contesting that matter.

Debtor after having liquidated the most valuable assets of ReadyCap now asks this Court to declare that ReadyCap does not have a valid security interest on any of the Bizgistics's assets. In fact, Bizgistics admitted that RCL had lien on its assets.   In Section 2.1 which asks the Debtor to "Describe Debtors property that is subject to a lien," Debtor listed "Vehicles; Accounts; All Assets."   Clearly, Bizgistics knew that RCL had a lien on its assets.   Having listed that on the schedules, Debtor should be estopped from denying the existence of the lien that it referenced.

Aside from Debtor's admission of RCL's lien, the loan documents also support the imposition of the lien on all assets. This was an SBA guaranteed loan. The SBA Authorization states that the Lender which was RCL shall take a "First Perfected Security Interest, subject to no other liens, in the following personal property (including any processes and products), whether now owned or later acquired wherever located: Equipment; Inventory; Accounts; Instruments; Chattel Paper; General Intangibles." While Debtor did not sign the SBA Authorization, it did sign a Loan Agreement on December 15, 2020. The loan agreement has the following language "Borrower and Lender agree as follows:

1. Subject to the terms and conditions of the Authorization….Lender agrees to make the Loan if Borrower complies with the following "Borrower Requirement"…Provide Lender with all certifications, documents or other information Lender requests or is required by the Authorization to obtain from Borrower…Do everything necessary for Lender to comply with the terms and conditions of the Authorization."

This was signed by Darrell K. Giles on behalf of Bizgistics. As stated above, one of the terms of the authorization was to give RCL a security interest in everything owned by Bizgistics or after acquired by it.

Aside from the loan documents that give RCL a security agreement, RCL filed a UCC with the state of Pennsylvania which is where Bizgistics is incorporated. A copy of the UCC acknowledgment is attached as Exhibit C. Therefore, RCL not only has a security interest in the property, it also has perfected its security interest by way of a recorded UCC which lists "All assets and property…All accounts, deposit accounts, accounts receivable no outstanding or hereafter arising…All contracts rights…chattel paper, general intangibles and payment intangibles now in force…"

The language of the UCC is very broad.  No one reading the UCC filing could have any doubt that it applied to all assets of the Debtor.  Therefore, irrespective of the timeliness of the Proof of Claim, RCL has a perfected security interest in all assets of the Debtor and that security interest supersedes any claim by any other claimant whether for unsecured debts or even priority claims.

Debtor may argue that the term general intangibles is not definite.  However, it has a specific meaning in the commercial business world. Under the Pennsylvania UCC in Section 9-102 (a) (42), general intangible refers to "[a]ny person property, including things in action…" Florida has the same definition.  Since Bizgistics was incorporated in Pennsylvania, Pennsylvania is the proper place to file the UCC pursuant to Section 9-301 (1).   It reads, "while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection…" Since Bizgistics is a Pennsylvania corporation, the perfection should be in the state the corporation resides in, not necessarily where it does business.

Finally, according to the UCC, a commercial tort claim means a claim arising in tort in the course of claimant's business."  Such is not the case here.  The claim did not arise out of the business operated by Bizgistics, but by allegations made against Banner Delivery and Gareth Banner for failure to disclose facts in the negotiating of the contract and in breach of contract which induced Bizgistics to purchase the business.  Therefore, this is not a commercial tort as no tort was committed during the operation of the Debtor's business.

## II.     WHETHER READYCAP WAIVED ITS RIGHT TO SEEK DISTRIBUTIONS FOR THE UNSECURED PORTION OF ITS CLAIM

Debtor argues that ReadyCap waived its right to seek any share of the funds that may be available to unsecured creditors because it did not file a proof of claim as an unsecured creditor. Such a position is not supported by the facts in this case or by the bankruptcy code. Bisgistics does not dispute that it gave a security interest to RCL when it executed the loan documents. Clearly as shown by the UCC filing, RCL perfected its security interest. Therefore, based on the loan documents and based on the UCC filing, RCL was secured for up to the full value of its loan. According to the loan documents, RCL lent Bizgistics $1,484,000.00. The Proof of Claim that RCL files showed that it was owed $1,485,914.20 at the time of the filing of the POC on January 6, 2022. In it schedules in the bankruptcy petition, Bizgistics represented that the value of its assets was $1,4200.00. This did not include the value of the claim against Banner Delivery and Gareth Banner which is listed as undetermined and the value of its service routes which were also listed an undetermined. This also does not include the value of the claim against Federal Express and the broker which put the deal together which Banner says that it is intending to pursue. Since the recovery from the lawsuits, assuming Bizgistics prevails, would exceed the value of the  RCL claim, it was not unreasonable for RCL to expect it claim to be fully secured. This is especially true when considering that the Debtor is under an obligation to deal honestly with the Court and its creditors. Bizgisics's position is that RCL should be denied the right to collect any unsecured part of its claim because it relied on the truthfulness of Bizgistics's representations in compiling the schedules.

Section 506 (a) (1) of the Bankruptcy Code also belies the position of the Debtor. That section states that a claim is a "secured claim to the extent of such creditor's interest in the estates interest in such property...and is an unsecured claim to the extent that the value of such creditor's interest is less than the amount of such allowed claim." Thus, the code expects that secured

creditors may not have sufficient security to satisfy their claims and are entitled to proceed as unsecured claims for the loss of value of their security.

This claim is a perfect example of the way the law is supposed to work. ReadyCap loaned the Debtor $1,484,000.00 and took a security interest in all of its assets which the parties expected would fully secure the debt. Unfortunately, the value of the security depreciated from the day of funding. Additionally, the bankruptcy estate needed to liquidate the assets as quickly as possible since the vehicles were not being driven and the other assets were not being used. Such neglect would only further depreciate the items in addition to adding to the holding costs. In reality the value of the assets was only about a third of the estimated value. RCL should not be penalized for the depreciation.

The intent of 11 U.S.C. Section 506 (a) (1) is to bifurcate a secured creditor's allowed claim into secured and unsecured portions based on the underlying collateral's value. *In re Brown*, 746 F.3d 1236, 1239 (11th Cir. 2014). Also, this Court cannot determine the validity of the secured claim until it determines whether the security interest extends to the causes of action. Even after that determination, the Court must wait to see how much is recovered from the causes of action. Only then can the court determine the value of secured claim as set out in Section 506 (a) (1).

RCL has not found any case law that has contradicted its interpretation of the statute. The only case previously cited by Bizgistics involved a case where a creditor filed a proof of claim as unsecured and later tried to claim secured status. The court found that the creditor was bound by its initial assertion that it was unsecured. That is not what has happened in this case. Absent case law to the contrary RCL is entitled to secured status up to the value of its lien on Debtor's assets and unsecured status for the remainder of the debt.

III.    <u>**WHETHER READYCAP HAS A SECUITY INTEREST IN THE CAUSES OF ACTION**</u>

RCL's security interest gave it a claim against all general intangibles.  Typically general intangibles have been defined to include causes of action that arise after the law suit was filed.  Obviously, the intent of the parties was to award RCL with the broadest lien possible.  The Florida UCC does not require exact specificity in describing collateral.  Fla Stat. 679.1081 (1) states, "a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described.  Section (2) of the same statute says, "a description of collateral reasonably identifies the collateral if it identifies the collateral by (b) Category."  Here the collateral is described as general intangibles which is an accepted category of asset under the UCC.  When considered in light of the relationship between the parties, it is presumed that the parties knew what they meant by general intangibles.  The parties described property as any proceed sna then breaks down the description into identifiable categories such as equipment, inventory, accounts, instruments, chattel paper, general intangibles.   Florida Statute 679.1021 (pp) goes on to say that "General intangibles" means any personal property, including things in action…"  Things in action clearly refer to litigation claims.  While the definition excludes "commercial tort claims," that exception is very specific.  Unfortunately, the UCC does not define the term "commercial tort claims" with much specificity.  We only know that the claims must arise in the commercial setting.

Commercial tort claims are generally considered as claims that arise "in the course of business."  First, it seems logical that the claim arose out of the operation of the business.  That is not the case here.  The claims that Bizgistics is asserting did not arise in the course of its business.  These claims all arose out of the actions of Banner Delivery and Gareth Banner in selling the

business to Bizgistics.  Those representations have nothing to do with the actual operation of the business or the servicing of its customers.  Therefore, RCL would argue that this is not a commercial tort.

Another argument against the finding that the claims are commercial torts is that it is too early to know what causes of action will be brought against Banner.  The cause of action brought may be a breach of contract or unjust enrichment which would not be commercial torts.  It could also be a conversion because Gareth Banner has retained insurance proceeds from a truck accident.  Until the claim is filed, the issue may not be ripe for determination if the court decides that a commercial tort does not have to arise during the operation of the business.

Finally, even if the court determines that any lawsuits filed would be commercial torts and not subject RCL's security agreement. Several courts have held that even if a lawsuit is defined as a commercial tort for purposes of determining whether or not it is covered by a security interest. Once the proceeds from the lawsuit become part of the bankruptcy estate, it is a payment intangible and is not limited by the restriction on commercial tort claims. the secured party's lien can attach to the proceeds.  *In re Wiersma*, 324 B.R. 92, 105-07 (B.A. P. 9th Cir. 2005), the court found that a bank had a security interest in settlement funds under the after-acquired general intangible provision of a security agreement, even though the settlement arose from a commercial tort.  See, also, *In re Sharah Michaels, Inc.*, 358 B. R. 366 (Bankr. N.D. Ill. 2007).

A further point that supports this is that the cause of actions that the Debtor may assert in its civil suit are all premised on the argument that Gareth Banner misrepresented the value of the business because it did not disclose that the business had been cited by Federal Express for deficiencies in its performance.  Thus, because the business was already in trouble with Federal Express, it was not worth the purchase price of 2.4 million dollars and the Debtor would not have

paid that purchase price had it known the value of the business.    Likewise, RCL would not have agreed to fund 1.4 million of the purchase price if it knew that the value of the business would not what was represented to it.  The business and its future revenues served as collateral for the loan. Any lawsuit proceeds arising out of the recovery for the loss of value of the collateral should inure to the benefit of the company that loaned the bulk of the purchase price to Bizgistics.  While the Debtor previously cited the case of *In re S-Tek 1, LLC* 635 B.R. 860 (Bankr. D.N.M. 2021) to support the idea that commercial tort claims are not covered in security agreements, the Debtor overlooks a policy reason for the court ruling the way it did.  Surv-Tek, the secured creditor, was one of the co-tortfeasors.  The proceed that it wanted to attach were from a settlement with the other tortfeasor.  Therefore, it would have been profiting in part from its own conduct and the court did not want to allow that to happen.  Such public policies do not exist in this case because RCL was not a party to any alleged misrepresentation by Banner Delivery and Gareth Banner.


**CONCLUSION**


For the reasons stated, ReadyCap Lending requests that this Court enter a summary judgment in its favor finding that it has a valid security interest in all assets of the Debtor, that to the extent that the Court determines that some assets are not subject to the lien the RCL be allowed to share in the proceeds pro-rata as an unsecured creditor if the allowed assets are not sufficient to pay RCL's secured claim, and that the Court find that any proceeds from the lawsuit against any party be found not to be a commercial tort or that the proceeds become an asset of the Debtor after they are received.

This 15th day of June, 2022.

   _s/ Clive N. Morgan

Clive N. Morgan
Florida Bar No. 357855
Busch Mills & Slomka, LLP
6712 Atlantic Blvd.
Jacksonville, FL 32211
Tel: (904) 508-0777
Email: cmorgan@buschmills.com
Attorney for ReadyCap

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the attached Motion for Relief from Stay

has been served via the electronic filing using CM/ECF system or by first class US mail

on following interested parties this 15nd day of June, 2022.

Megan W. Murray
mmurray@underwoodmurray.com
Adam M. Gilbert
agilbert@underwoodmurray.com
Attorneys for Debtor

Bizgistics
925 Morgan Road
Rydal, PA 19046-3028

Aaron R. Cohen
Acohen60@bellsouth.net
Subchapter V Trustee

  s/ Clive N. Morgan
Clive N. Morgan
Florida Bar No. 357855

.



U.S. Small Business Administration

# AUTHORIZATION
## (SBA 7(A) GUARANTEED LOAN)

U.S. Small Business Administration

| SBA Loan # | PLP 93044782-09 |
|---|---|
| SBA Loan Name | Bizgistics, Inc. |
| Approval Date | December 1, 2020 |

Lender:

ReadyCap Lending, LLC
200 Connell Drive, Suite 4000
Berkeley Heights, NJ 07922

U. S. Small Business Administration (SBA):

North Florida District Office
7825 Baymeadows Way, Suite 100B
Jacksonville, FL 32256

SBA approves, under Section 7(a) of the Small Business Act as amended, Lender's application, received December 1, 2020, for SBA to guaranty 75.00% of a loan ("Loan") in the amount of $1,484,000.00 to assist:

Borrower:

1.  Bizgistics, Inc.
    13509 Waterworks Street
    Jacksonville, FL 32246

All requirements in the Authorization which refer to Borrower also apply to any Co-Borrower.

### A.   THE GUARANTY FEE IS $39,237.50.

Lender must pay the guaranty fee within 90 days of the approval date of this Authorization. Failure to timely pay the guaranty fee will result in cancellation of the SBA guarantee. The 90-day deadline may not be extended. Lenders are required to make their payments electronically. Payment can be made at www.pay.gov or by ACH if they have previously enrolled with the SBA. No part of the guaranty fee is refundable if Lender has made any disbursement. Lender may collect this fee from Borrower after initial disbursement of Loan, except when an escrow closing is used, Lender may not collect the fee until all Loan funds have been disbursed to the Borrower from the escrow account. Borrower may use Loan proceeds to reimburse Lender for the guaranty fee.

For loans of $150,000 or less, Lender may retain 25% of any required guaranty fee but must remit the remainder to SBA.

### B.   ON-GOING GUARANTY FEE (Lender's Annual Service Fee):

1.  Lender agrees to pay SBA an on-going guaranty fee equal to 0.550 of one percent per year of the guaranteed portion of the outstanding balance.

2.  Lender may not charge or otherwise pass through this fee to Borrower.

SBA Loan Number: PLP 93044782-09
SBA Loan Name: Bizgistics, Inc.

Page 1
(7a Wizard 2018)

C. **IT IS LENDER'S SOLE RESPONSIBILITY TO:**

1. Close the Loan in accordance with the terms and conditions of this Authorization.

2. Obtain valid and enforceable Loan documents, including obtaining the signature or written consent of any obligor's spouse if such consent or signature is necessary to bind the marital community or create a valid lien on marital property.

3. Retain all Loan closing documents. Lender must submit these documents, along with other required documents, to SBA for review if Lender requests SBA to honor its guarantee on the Loan, or at any time SBA requests the documents for review.

D. **REQUIRED FORMS**

NOTE: LENDER MAY USE ITS OWN NOTE AND GUARANTEE AGREEMENTS IN LIEU OF THE SBA NOTE AND GUARANTEE AGREEMENTS. IF LENDER USES ITS OWN NOTE AND/OR GUARANTEE FORMS, LENDER MUST ENSURE THE DOCUMENTS COMPLY WITH THE REQUIREMENTS SET FORTH IN SOP 50 10.

1. Lender may use its own forms except as otherwise instructed in this Authorization. Lender must use the following SBA forms for the Loan:

    SBA Form 147, Note or Lender's own Note that complies with SOP 50 10
    SBA Form 1050, Settlement Sheet
    SBA Form 159, Compensation Agreement, for each required agent
    SBA Form 722, Equal Opportunity Poster
    Guarantee: SBA Form 148 or Lender equivalent

2. Lender may use computer-generated versions of mandatory SBA Forms, as long as the text is identical.

3. Lender must submit a copy of each completed SBA Form 159 by email to the SBA fiscal and transfer agent after initial disbursement and in conjunction with Lender's 1502 Report for the month. Lender must maintain each original SBA Form 159 in its file.

E. **CONTINGENCIES**—SBA issues this Authorization in reliance on representations in the Loan application, including supporting documents. The guarantee is contingent upon Lender:

1. Having and complying with a valid SBA Loan Guarantee Agreement (SBA Form 750, SBA Form 750B for short-term loans, or 750CA for Community Advantage (CA) loans, if applicable) and any required supplemental guarantee agreements, between Lender and SBA;

2. Having paid the full guaranty fee in the time and manner required by this Authorization and SBA Loan Program Requirements;

3. Complying with the current SOP 50 10 and all applicable appendices;

4. Completing disbursement no later than 48 months from the approval date of this Authorization. (The loan must be fully disbursed within 48 months from the date of this Authorization. Any undisbursed balance remaining after 48 months will be automatically cancelled by SBA.);

5. Having no evidence since the date of the Loan application, or since any preceding disbursement, of any unremedied adverse change in the financial condition, organization, management, operation, or assets of Borrower or Operating Company which would warrant withholding or not making any further disbursement; and,

6. Satisfying all of the conditions in this Authorization.

---

F.  **NOTE TERMS**:

1.  **Maturity**:  This Note will mature in 10 years from date of initial disbursement.

2.  **Repayment Terms**:

If Lender uses its own Note, Lender must comply with the repayment terms set forth below and must ensure the Note is legally enforceable and assignable, has a stated maturity and is not payable on demand. The Note must include the following language:

*"When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law."*

If Lender uses SBA Note, Form 147, Lender must insert into Note, to be executed by Borrower, the following terms, without modification. Lender must complete all blank terms on the Note at time of closing.

The interest rate on this Note will fluctuate. The initial interest rate is 6.00% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.75%. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay one payment of interest only on the disbursed principal balance one month from the month of initial disbursement on this Note; payment must be made on the first calendar day in the month it is due.

Borrower must pay principal and interest payments of $16,475.44 every month, beginning two months from the month of initial disbursement on this Note; payments must be made on the first calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted every calendar quarter (the "change period") beginning January 1, 2021 (date of first rate adjustment).

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.75% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a.    Give Lender written notice;

b.    Pay all accrued interest; and

c.    If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 10 years from date of initial disbursement.

**Late Charge:** If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

G.   **USE OF PROCEEDS**

1.    $18,000.00 to purchase equipment.

2.    $1,217,500.00 to purchase the business known as Banner Delivery, Inc., according to the executed Purchase Agreement dated December 11, 2020, including $2,034,088.00 for intangible assets described as Goodwill.

3.    $39,238.00 to pay the guaranty fee. (Lender may not disburse Loan proceeds solely to pay the guaranty fee).

4.    $209,262.00 for working capital.

All amounts listed above are approximate. Lender may not disburse Loan proceeds solely to pay the guaranty fee. Lender may disburse to Borrower, as working capital only, funds not spent for the listed purposes as long as those funds do not exceed 20% of the specific purpose authorized or $50,000.00, whichever is less. An Eligible Passive Company may not receive working capital funds or funds to be used for the purchase of other assets, including intangible assets, for the Operating Company's use.

The loan must be made for a sound business purpose and must benefit the small business, and one 7(a) loan may not be split into two 7(a) loans merely to benefit the Lender. 13 CFR 120.120 and 120.130(f).

Lender must document that Borrower used the loan proceeds for the purposes stated in this Authorization. Except under SBA Express, Export Express, and 7(a) Small Loans, Lender and Borrower must complete and sign SBA Form 1050 at the time of first disbursement. Lender must document the first and all subsequent disbursements by attaching required documentation to the original SBA Form 1050 and must maintain the documentation in the Loan file, following the procedures described in SOP 50 10.

H.   **COLLATERAL CONDITIONS**

Lender must obtain a lien on 100% of the interests in the following collateral and properly perfect all lien positions.

The following language must appear in Lender's Guarantee when Lender uses its own Guarantee.

*"When SBA is the holder, the Note and this Guarantee will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claims of SBA, or preempt federal law."*

1.   **First Perfected Security Interest, subject to no other liens,** in the following personal property (including any proceeds and products), whether now owned or later acquired, wherever located:
     Equipment; Inventory; Accounts; Instruments; Chattel Paper; General Intangibles;

     a.   Lender must obtain a list of all equipment and fixtures that are collateral for the Loan. For items with a unit value of $5,000 or more, the list must include a description and serial number, if applicable.

     b.   Lender must obtain an appropriate Uniform Commercial Code lien search evidencing all required lien positions. If UCC search is not available, another type of lien search may be substituted.

2.   **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZA4FF41XCA61161, Year: 1999.

     a.   Subject to no other liens.

3.   **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZA4FF40XCA49809, Year: 1999.

     a.   Subject to no other liens.

4.   **First Security Interest on the following Vehicle**—Make or Model: International - VIN #1HTMGABM01A930174, Year: 2001.

     a.   Subject to no other liens.

5.   **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAARDU18CZ58931, Year: 2008.

SBA Loan Number: PLP 93044782-09
SBA Loan Name: Bizgistics, Inc.

Page 5
(7a Wizard 2018)

    a.   Subject to no other liens.

6. **First Security Interest on the following Vehicle**—Make or Model: Ford - VIN #1F65F5KY7D0A13678, Year: 2013.

    a.   Subject to no other liens.

7. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAARDUXECFK8393, Year: 2014.

    a.   Subject to no other liens.

8. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAARDU1ECFK8413, Year: 2014.

    a.   Subject to no other liens.

9. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAARDU0GCHH5792, Year: 2016.

    a.   Subject to no other liens.

10. **First Security Interest on the following Vehicle**—Make or Model: Ford - VIN # 1FC3E4KL5GDC13591, Year: 2016.

    a.   Subject to no other liens.

11. **First Security Interest on the following Vehicle**—Make or Model: Ford - VIN # 1FC3E4KL6GDC13079, Year: 2016.

    a.   Subject to no other liens.

12. **First Security Interest on the following Vehicle**—Make or Model: Ford - VIN # 1FC3E4KL2GDC13080, Year: 2016.

    a.   Subject to no other liens.

13. **First Security Interest on the following Vehicle**—Make or Model: Ford - VIN # 1FC3E4KL3GDC13590, Year: 2016.

    a.   Subject to no other liens.

14. **First Security Interest on the following Vehicle**—Make or Model: Ford - VIN # 1F65F5KY3G0A15965, Year: 2016.

    a.   Subject to no other liens.

15. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAARDU3HCHW8504, Year: 2017.

    a.   Subject to no other liens.

16. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN # 4UZAARDU8HCJE8059, Year: 2017.

    a.   Subject to no other liens.

17. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN # 4UZAARDU5HCJC2406, Year: 2017.

    a.   Subject to no other liens.

18. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAARDU7HCJC2410, Year: 2017.

    a.    Subject to no other liens.

19. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN # 4UZAARDU7HCJC2407, Year: 2017.

    a.    Subject to no other liens.

20. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAARDU9HCJC2408, Year: 2017.

    a.    Subject to no other liens.

21. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAARDU6HCJD1843, Year: 2017.

    a.    Subject to no other liens.

22. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAANFD6JCJP7821, Year: 2018.

    a.    Subject to no other liens.

23. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAANFD7JCJY4082, Year: 2018.

    a.    Subject to no other liens.

24. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN # 4UZAARFD6JCJY4114, Year: 2018.

    a.    Subject to no other liens.

25. **First Security Interest on the following Vehicle**—Make or Model: Freightliner - VIN #4UZAAPFD1KCKN9145, Year: 2019.

    a.    Subject to no other liens.

26. **First Security Interest on the following Vehicle**—Make or Model: Frieghtliner - VIN #4UZAAPFD3KCKN9146, Year: 2019.

    a.    Subject to no other liens.

27. **Guarantee on SBA Form 148** or equivalent lender's form, by Darrell Giles, resident in Pennsylvania.

Secured by:

    a.    **Third Mortgage** (including water rights, if any and assignment of rents) on land and improvements located at 925 Morgan Road, Rydal, PA. This property is residential.

        (1)   Subject only to prior lien(s) as follows:
            (a)  First:  TB Bank in the amount of $475,658.00
            (b)  Second:  TD Bank in the present amount of $92,375.44, with a revolving provision limited to a total principal outstanding of $250,000.00

        (2)   Any prior open ended lien(s) that is (are) open ended as to future advances must be closed in writing according to applicable state law.  The revolving line(s) of credit set out above, if any, must be limited in writing to the amount stated.

        (3)   Lender must obtain from prior lienholders written verification (1) of amount owing on prior obligation, (2) that prior obligation is current on payments, and (3) that prior obligation is not otherwise in default.

SBA Loan Number: PLP 93044782-09
SBA Loan Name: Bizgistics, Inc.

Page 7
(7a Wizard 2018)

(4) Evidence of title and priority of lien must be based upon:
    (a) ALTA Loan Policy, insuring lender and assigns, policy to be without standard exceptions ("extended ALTA") and without arbitration clause, in the amount of $1,484,000.00.

28. **Guarantee on SBA Form 148** or equivalent lender's form, by Susan Giles, resident in Pennsylvania.

Secured by:

a. **Third Mortgage** (including water rights, if any and assignment of rents) on land and improvements located at 925 Morgan Road, Rydal PA 19046. This property is residential.
    (1) Subject only to prior lien(s) as follows:
        (a) First: TD Bank in the amount of $475,658.00
        (b) Second: TD Bank in the present amount of $92,375.44, with a revolving provision limited to a total principal outstanding of $250,000.00
    (2) Any prior open ended lien(s) that is (are) open ended as to future advances must be closed in writing according to applicable state law. The revolving line(s) of credit set out above, if any, must be limited in writing to the amount stated.
    (3) Lender must obtain from prior lienholders written verification (1) of amount owing on prior obligation, (2) that prior obligation is current on payments, and (3) that prior obligation is not otherwise in default.
    (4) Evidence of title and priority of lien must be based upon:
        (a) ALTA Loan Policy, insuring lender and assigns, policy to be without standard exceptions ("extended ALTA") and without arbitration clause, in the amount of $1,484,000.00.

The following language must appear in all security instruments including Mortgages, Deeds of Trust, and Security Agreements:

*"The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:*

*a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.*

*b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax, or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.*

*c) Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument."*

**Pennsylvania Mandatory Provision**—Lender must include valid confession of judgment clauses in guarantees signed by Pennsylvania residents.

I. **ADDITIONAL CONDITIONS**

1. **Insurance Requirements**

Prior to disbursement, Lender must require Borrower to obtain the following insurance coverage and maintain this coverage for the life of Loan:

a. **Real Estate Hazard Insurance** coverage (including any required additional coverage, such as wind, hail, earthquake, etc., if the business is located in a state that requires additional coverage) on all real estate that is collateral for the Loan in the amount of the full replacement cost. If full replacement cost insurance is not available, coverage must be for maximum insurable value. Insurance coverage must contain a <u>MORTGAGEE CLAUSE</u> (or substantial equivalent) in favor of Lender. This clause must provide that any action or failure to act by the mortgagor or owner of the insured property will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

b. **Life Insurance**, satisfactory to Lender:

  (1) on the life of Darrell Giles in the amount of $800,000.00.

  Lender must obtain a collateral assignment of each policy with Lender as assignee and Lender must also obtain acknowledgment of the assignment by the Home Office of the Insurer. Lender must ensure that Borrower pays the premium on the policy.

c. **Workers' Compensation Insurance** in an amount meeting state law requirements and with an insurance company satisfactory to Lender.

d. Vehicle Liability Insurance

2. **Borrower, Guarantor and Operating Company Documents**

a. Prior to closing, Lender must obtain from Borrower, Guarantor and Operating Company a current copy of each of the following as appropriate:

  (1) **Corporate Documents**—Articles or Certificate of Incorporation (with amendments), any By-laws, Certificate of Good Standing (or equivalent), Corporate Borrowing Resolution, and, if a foreign corporation, current authority to do business within this state.

  (2) **Limited Liability Company (LLC) Documents**—Articles of Organization (with amendments), Fact Statement or Certificate of Existence, Operating Agreement, Borrowing Resolution, and evidence of registration with the appropriate authority.

  (3) **General Partnership Documents**—Partnership Agreement, Certificate as to Partners, and Certificate of Partnership or Good Standing (or equivalent), as applicable.

  (4) **Limited Partnership Documents**—Partnership Agreement, Certificate as to Partners, and Certificate of Partnership or Good Standing (or equivalent), as applicable, Certificate of Limited Partnership, and evidence of registration with the appropriate authority.

  (5) **Limited Liability Partnership (LLP) Documents**—Partnership Agreement, Certificate as to Partners, Certificate of Partnership or Good Standing (or equivalent) as applicable, and evidence of registration with the appropriate authority.

  (6) **Trustee Certification**—A Certificate from the trustee warranting that:
   (a) The trust will not be revoked or substantially amended for the term of the Loan without the consent of Lender/SBA;
   (b) The trustee has authority to act;
   (c) The trust has the authority to borrow funds, guarantee loans, and pledge trust assets;
   (d) If the trust is an Eligible Passive Company, the trustee has authority to lease the property to the Operating Company;

SBA Loan Number: PLP 93044782-09
SBA Loan Name: Bizgistics, Inc.

Page 9
(7a Wizard 2018)

      (e)  There is nothing in the trust agreement that would prevent Lender from realizing on any security interest in trust assets;

      (f)  The trust agreement has specific language confirming the above; and

      (g)  The trustee has provided and will continue to provide Lender/SBA with a true and complete list of all trustors and donors.

  (7)  **Trade Name**—Documentation that Borrower has complied with state requirements for registration of Borrower's or Operating Company's trade name (or fictitious name), if one is used.

b.  Prior to closing, Lender must obtain from Borrower and Operating Company:

  (1)  **Ownership**—Evidence that ownership and management have not changed without Lender's approval since the application was submitted.

  (2)  **Purchase-Sale Agreement**—Executed Purchase-Sale Agreement.

3.  **Operating Information**

Prior to any disbursement of Loan proceeds, Lender must obtain:

a.  **Verification of Financial Information**—Lender must submit IRS Form 4506-T to the Internal Revenue Service to obtain federal income tax information on Borrower, or the Operating Company if the Borrower is an EPC, for the last 3 years (unless Borrower or Operating Company is a start-up business). If the business has been operating for less than 3 years, Lender must obtain the information for all years in operation. This requirement does not include tax information for the most recent fiscal year if the fiscal year-end is within 6 months of the date SBA received the application. If the applicant has filed an extension for the most recent fiscal year, Lender must obtain a copy of the extension along with evidence of payment of estimated taxes. Lender must compare the tax data received from the IRS with the financial data or tax returns submitted with the Loan application, and relied upon in approving the Loan. Borrower must resolve any significant differences to the satisfaction of Lender and SBA. Failure to resolve differences may result in cancellation of the Loan.

If the Loan involves a change of ownership, Lender must verify financial information provided by the seller of the business in the same manner as above.

If the IRS responds and the transcript reflects "Record not Found" for any tax year, Lender must follow the procedures detailed in SOP 50 10 to determine what steps must be taken to satisfy the SBA tax verification requirement.

If Lender is processing a loan under its delegated authority and does not receive a response from the IRS or copy of the tax transcript within 10 business days of submitting the IRS Form 4506-T, then Lender may close and disburse the loan provided that Lender sends a second request following precisely the procedures detailed in SOP 50 10 and Lender performs the verification and resolves any significant differences discovered, even if the Loan is fully disbursed.

b.  **Authority to Conduct Business**—Evidence that Borrower and Operating Company have an Employer Identification Number and all insurance, licenses, permits and other approvals necessary to lawfully operate the business, including, but not limited to, the ability to operate at the business location.

c.  **Flood Hazard Determination**—A completed Standard Flood Hazard Determination (FEMA Form 086-0-32).

4.  **Injection**

Lender must obtain evidence that prior to disbursement:

a. **Cash Injection**—At least $642,500.00 cash has been injected into the project. This cash is for Purchase Business and Closing Costs. The source of the cash is Personal Fidelity Account Ending 8411 of Darrell Giles.

5. **Standby Agreement**

a. Lender to obtain Standby Creditor's Agreement from Gareth E. Banner, for $600,000.00, plus all accrued and future interest (Standby Debt) on standby for 2 years and amortized over 8 year term at 2.50% may be made if Borrower is not in default under the Note. Standby Creditor must subordinate any lien rights in collateral securing the Loan to Lender's rights in the collateral, and take no action against Borrower or any collateral securing the Standby Debt without Lender's consent. Lender must attach a copy of the Standby Note evidencing the Standby Debt to the Standby Creditor's Agreement. Lender may use its own form or SBA Form 155.

6. **Appraisal**

Prior to disbursement, and in accordance with SOP 50 10, Lender must obtain:

a. **Real Estate Appraisal** on the real property located at 925 Morgan Road Rydal, PA 19046, showing a fair market value of at least $1,075,000.00.

b. **Equipment Appraisal** on the equipment (and fixtures if not included in a real estate appraisal) described as Vehicles (Fed Ex), showing a fair market value of at least $1,142,000.00.

7. **Business Valuation**

a. Prior to disbursement, and in accordance with SOP 50 10, Lender must request and obtain a business valuation of Banner Delivery, Inc., showing a value of $2,450,000.00, exclusive of the appraised value of real estate and equipment.

b. Lender must obtain a copy of the financial information relied upon by the individual who performed the business valuation and verify that information against the seller's IRS transcripts to ensure the accuracy of the information.

c. Any amount in excess of the business valuation may not be financed with the SBA guaranteed loan.

8. **Certifications and Agreements**

a. Prior to disbursement, Lender must require Borrower and Operating Company to certify that:

(1) **Receipt of Authorization**—Borrower and Operating Company have received a copy of this Authorization from Lender, and acknowledge that:
   (a) The Authorization is <u>not</u> a commitment by Lender to make a loan to Borrower;
   (b) The Authorization is between Lender and SBA and creates no third party rights or benefits to Borrower;
   (c) The Note will require Borrower to give Lender prior notice of intent to prepay.
   (d) If Borrower defaults on Loan, SBA may be required to pay Lender under the SBA guaranty. SBA may then seek recovery of these funds from Borrower. Under SBA regulations, 13 CFR Part 101, Borrower may not claim or assert against SBA any immunities or defenses available under local law to defeat, modify or otherwise limit Borrower's obligation to repay to SBA any funds advanced by Lender to Borrower.

(e) Payments by SBA to Lender under SBA's guarantee will not apply to the Loan account of Borrower, or diminish the indebtedness of Borrower under the Note or the obligations of any personal guarantor of the Note.

(f) If the small business defaults on the SBA-guaranteed loan and SBA suffers a loss, the names of the small business and the guarantors of the SBA-guaranteed loan will be referred for listing in the Credit Alert Verification Reporting System (CAIVRS) database, which may affect their eligibility for further financial assistance.

(2) There has been no adverse change in Borrower's (and Operating Company's) financial condition, organization, operations, or fixed assets since the date the Loan application was signed.

(3) **Child Support**—No principal who owns at least 50% of the ownership or voting interest of the company is delinquent more than 60 days under the terms of any (a) administrative order, (b) court order, or (c) repayment agreement requiring payment of child support.

(4) **Current Taxes**—Borrower and Operating Company are current (or will be current with any loan proceeds specified for eligible tax payments) on all federal, state, and local taxes, including but not limited to income taxes, payroll taxes, real estate taxes, and sales taxes.

(5) **Environmental**—For any real estate pledged as collateral for the Loan or where the Borrower or Operating Company (if applicable) is conducting business operations (collectively "the Property"):

(a) At the time Borrower and Operating Company submitted the Loan application, Borrower was in compliance with all local, state, and federal environmental laws and regulations pertaining to reporting or clean-up of any hazardous substance, hazardous waste, petroleum product, or any other pollutant regulated by state or federal law as hazardous to the environment (Contaminant), and regarding any permits needed for the creation, storage, transportation or disposal of any Contaminant;

(b) Borrower and Operating Company will continue to comply with these laws and regulations;

(c) Borrower and Operating Company, and all of its principals, have no knowledge of the actual or potential existence of any Contaminant that exists on, at, or under the Property, including groundwater under such Property, other than what was disclosed in connection with the Environmental Investigation of the Property;

(d) Until full repayment of the Loan, Borrower and Operating Company will promptly notify Lender and SBA if it knows or suspects that there has been, or may have been, a release of a Contaminant in, at, or under the Property, including groundwater, or if Borrower or Operating Company or such Property are subject to any investigation or enforcement action by any federal, state, or local environmental agency (Agency) pertaining to any Contaminant on, at, or under such Property, including groundwater;

(e) As to any Property owned by Borrower or Operating Company, Borrower and Operating Company indemnifies, and agrees to defend and hold harmless, Lender and SBA, and any assigns or successors in interest which take title to the Property, from and against all liabilities, damages, fees, penalties or losses arising out of any demand, claim or suit by any Agency or any other party relating to any Contaminant found on, at, or under the Property, including groundwater, regardless of whether such Contaminant resulted from Borrower's

or Operating Company's operations.  (Lender or SBA may require Borrower and Operating Company to execute a separate indemnification agreement).

b.  Prior to disbursement, Lender must require Borrower and Operating Company to certify that they will:

(1) **Reimbursable Expenses**—Reimburse Lender for expenses incurred in the making and administration of the Loan.

(2) **Books, Records, and Reports**—
   (a) Keep proper books of account in a manner satisfactory to Lender;
   (b) Furnish year-end statements to Lender within 120 days of fiscal year end;
   (c) Furnish additional financial statements or reports whenever Lender requests them;
   (d) Allow Lender or SBA, at Borrower's or Operating Company's expense, to:
      [1] Inspect and audit books, records and papers relating to Borrower's and Operating Company's financial or business condition; and
      [2] Inspect and appraise any of Borrower's and Operating Company's assets; and
      [3] Allow all government authorities to furnish reports of examinations, or any records pertaining to Borrower and Operating Company, upon request by Lender or SBA.

(3) **Equal Opportunity**—Post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public.

(4) **American-made Products**—To the extent practicable, purchase only American-made equipment and products with the proceeds of the Loan.

(5) **Taxes**—Pay all federal, state, and local taxes, including income, payroll, real estate and sales taxes of the business when they come due.

(6) **Leasing** – During the life of the loan, the real estate pledged as Collateral for the Loan or where the Borrower or Operating Company conducts its business operations will not be leased to or occupied by any business that Borrower or Operating Company knows is engaged in any activity that is illegal under federal, state or local law or any activity that can reasonably be determined to support or facilitate any activity that is illegal under federal, state, or local law.

c.  Lender must require Borrower and Operating Company to certify that they will not, without Lender's prior written consent:

(1) **Distributions**—Make any distribution of company assets that will adversely affect the financial condition of Borrower and/or Operating Company.

(2) **Ownership Changes**—Change the ownership structure or interests in the business during the term of the Loan.

(3) **Transfer of Assets**—Sell, lease, pledge, encumber (except by purchase money liens on property acquired after the date of the Note), or otherwise dispose of any of Borrower's property or assets, except in the ordinary course of business.

SBA Loan Number: PLP 93044782-09
SBA Loan Name: Bizgistics, Inc.

Page 13
(7a Wizard 2018)

ADMINISTRATOR
SMALL BUSINESS ADMINISTRATION

December 1, 2020

By:  Elizabeth Bastedo, Authorized Person,                              Date
     a Preferred Lender, as Lender and as an agent of and on behalf of the SBA for the purpose of
     executing this Authorization.

Account #: 0551591-6101

## LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is made December 15, 2020, between the Borrower and Lender pursuant to the attached Authorization issued by the U. S. Small Business Administration ("SBA") to Lender, dated December 1, 2020 SBA Loan Number PLP93044782-09 ("Authorization").

The SBA has authorized a guaranty of a loan from Lender to Borrower for the amount and under the terms stated in the attached Authorization (the "Loan").

In consideration of the promises in this Agreement and for other good and valuable consideration, Borrower and Lender agree as follows:

1. Subject to the terms and conditions of the Authorization and SBA's Participating Lender Rules (as defined in the Guarantee Agreement between Lender and SBA), Lender agrees to make the Loan if Borrower complies with the following "Borrower Requirements". Accordingly, Borrower shall:

    a. Provide Lender with all certifications, documents or other information Lender requests or is required by the Authorization to obtain from Borrower or any third party;

    b. Execute a promissory note and all other documents required by Lender; and

    c. Do everything necessary for Lender to comply with the terms and conditions of the Authorization.

2. The terms and conditions of this Agreement:

    a. Are binding on Borrower and Lender and their successors and assigns; and

    b. Will remain in effect after the closing of the Loan.

3. Failure to abide by any of the Borrower Requirements will constitute an event of default under the note and other Loan documents.

**BORROWER:**

**BIZGISTICS, INC.**

By: _Darrell K. Giles_

Darrell K. Giles, President

Lender: **READYCAP LENDING, LLC**

By: _____

Account #: 0551591-6101

## LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is made December 15, 2020, between the Borrower and Lender pursuant to the attached Authorization issued by the U. S. Small Business Administration ("SBA") to Lender, dated December 1, 2020 SBA Loan Number PLP93044782-09 ("Authorization").

The SBA has authorized a guaranty of a loan from Lender to Borrower for the amount and under the terms stated in the attached Authorization (the "Loan").

In consideration of the promises in this Agreement and for other good and valuable consideration, Borrower and Lender agree as follows:

1. Subject to the terms and conditions of the Authorization and SBA's Participating Lender Rules (as defined in the Guarantee Agreement between Lender and SBA), Lender agrees to make the Loan if Borrower complies with the following "Borrower Requirements". Accordingly, Borrower shall:

    a. Provide Lender with all certifications, documents or other information Lender requests or is required by the Authorization to obtain from Borrower or any third party;

    b. Execute a promissory note and all other documents required by Lender; and

    c. Do everything necessary for Lender to comply with the terms and conditions of the Authorization.

2. The terms and conditions of this Agreement:

    a. Are binding on Borrower and Lender and their successors and assigns; and

    b. Will remain in effect after the closing of the Loan.

3. Failure to abide by any of the Borrower Requirements will constitute an event of default under the note and other Loan documents.

**BORROWER:**

**BIZGISTICS, INC.**

By: _Darrell K. Giles_

Darrell K. Giles, President


Lender: **READYCAP LENDING, LLC**

By: _____

Exhibit C

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐ UCC eZFILE
2020 Hurley Way
Sacramento, CA 95825 ⌐

**Acknowledged**
**File Date: 11/10/2020**
**File Number: 2020111001264**
**Jurisdiction: PENNSYLVANIA**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bizgistics, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 925 Morgan Road | Rydal | PA | 19046 | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ReadyCap Lending, LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 200 Connell Drive, Suite 4000 | Berkeley Heights | NJ | 07922 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

EXHIBIT A

All assets and property including but not limited to the following:

All equipment and machinery, (excluding motor vehicles), including power-driven machinery and equipment, furniture and trade fixtures now owned or hereafter acquired, together with all replacements thereof, all attachments, accessories, accessions, parts and tools

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)** International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT **ADDENDUM**
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR:  Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

Bizgistics, Inc.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME:  Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME:  Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
belonging thereto or for use in connections therewith, wherever located.

All goods and accessions.

All inventory, raw materials, work in process and supplies now owned or hereafter acquired.

All accounts, deposit accounts, accounts receivable now outstanding or hereafter arising, and all books, and records pertaining thereto and all

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable) | 14. This FINANCING STATEMENT: |
|---|---|
| | ☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

**COLLATERAL DESCRIPTION, CONTINUED**

Bizgistics, Inc.

additions, substitutions, replacements and proceeds thereof.

All contract rights, documents, instruments and promissory notes, investment property, chattel paper, general intangibles and payment intangibles now in force or hereafter acquired, including good will and all other assets, leases, rights to leases or leased properties.

All of the above, whether now or hereafter owned and wherever located and the proceeds thereof.

All the described collateral falls within the scope of Article 9 as enacted by the state.