# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION
### www.flmb.uscourts.gov

| | |
|---|---|
| In re | Chapter 11 |
| BIZGISTICS, INC. | Case No. 3:21-bk-02197-RCT |
| Debtor._____/ | |

## MOTION TO SURCHARGE PURSUANT TO 11 U.S.C. § 506(c)

Bizgistics, Inc. ("**Debtor**"), by and through undersigned counsel, files this Motion to Surcharge Collateral of ReadyCap Lending LLC Pursuant to 11 U.S.C. § 506(c) ("**Motion**"), and in furtherance thereof states as follows.

### Preliminary Statement

The estate should not be responsible for expenses the Debtor incurred to protect and dispose of ReadyCap's collateral, especially in this case where ReadyCap was given an opportunity to direct the sales of its collateral or recover its collateral but chose not to do so, increasing costs to the estate. Surcharge is the appropriate remedy to avoid a burden on the estate, and in this case, as presented below, the costs are well within reason.

### Background

1. The Debtor filed its Voluntary Petition for Relief under Subchapter V of Chapter 11 (the "**Petition**") (Doc. No. 1) on September 12, 2021. Shortly thereafter, on September 15, 2021, the Debtor filed its Chapter 11 Case Management Summary ("**Case Management Summary**") (Doc. No. 17) which outlined the Debtor's projected restructuring options.

2. The Case Management Summary informed all parties in interest that, while the Debtor hoped to finalize a renewal of its existing delivery contract with FedEx Ground Package

Systems, Inc., ("**FedEx**") in the event the Debtor was unable to do so, the Debtor intended to liquidate its remaining assets, which consisted primarily of delivery vehicles (the "**Vehicles**"), for the benefit of creditors.

3. As this Court is aware, the Debtor was unable to reach an agreement to renew its delivery contract with FedEx and it embarked on a process to sell Vehicles which had an electronic lien in favor of ReadyCap Lending LLC ("**ReadyCap**") noted on each of the titles, as indicated below:

| Unit # | Year | Make | Body Type | VIN | Lien notated on Certificate of Title |
|---|---|---|---|---|---|
| 305518 | 1999 | Freightliner | Walk In P700 | 4UZA4FF41XCA61161 | ReadyCap |
| 310920 | 1999 | Freightliner | Walk In P700 | 4UZA4FF40XCA49809 | ReadyCap |
| 96703 | 2001 | International | Walk In P1200 | 1HTMGABM01A930174 | ReadyCap |
| 85330 | 2008 | Freightliner | Walk In P1000 | 4UZAARDU18CZ58931 | ReadyCap |
| 313337 | 2013 | Ford | Walk In P1000 | 1F65F5KY7D0A13678 | ReadyCap |
| 87303 | 2014 | Freightliner | Walk In P1200 | 4UZAARDUXECFK8393 | ReadyCap |
| 87323 | 2014 | Freightliner | Walk In P1200 | 4UZAARDU1ECFK8413 | ReadyCap |
| 87744 | 2016 | Freightliner | Walk In P1200 | 4UZAARDU0GCHH5792 | ReadyCap |
| 321455 | 2016 | Ford | Walk In P700 | 1FC3E4KL5GDC13591 | ReadyCap |
| 321456 | 2016 | Ford | Walk In P700 | 1FC3E4KL6GDC13079 | ReadyCap |
| 321457 | 2016 | Ford | Walk In P700 | 1FC3E4KL2GDC13080 | ReadyCap |
| 321458 | 2016 | Ford | Walk In P700 | 1FC3E4KL3GDC13590 | ReadyCap |
| 325569 | 2016 | Ford | Box P1000 | 1F65F5KY3G0A15965 | ReadyCap |
| 325568 | 2017 | Freightliner | Box P1200 | 4UZAARDU3HCHW8504 | ReadyCap |
| 402362 | 2017 | Freightliner | Walk In P1200 | 4UZAARDU8HCJE8059 | ReadyCap |
| 405080 | 2017 | Freightliner | Box P1000 | 4UZAARDU5HCJC2406 | ReadyCap |
| 405658 | 2017 | Freightliner | Box P1000 | 4UZAARDU7HCJC2410 | ReadyCap |
| 405659 | 2017 | Freightliner | Box P1200 | 4UZAARDU7HCJC2407 | ReadyCap |
| 405660 | 2017 | Freightliner | Box P1200 | 4UZAARDU9HCJC2408 | ReadyCap |
| 408050 | 2017 | Freightliner | Walk In P1000 | 4UZAARDU6HCJD1843 | ReadyCap |
| 405665 | 2018 | Freightliner | Box P1000 | 4UZAANFD6JCJP7821 | ReadyCap |
| 408049 | 2018 | Freightliner | Walk In P700 | 4UZAANFD7JCJY4082 | ReadyCap |
| 408051 | 2018 | (Accident Truck) | Walk In P1200 | 4UZAARFD6JCJY4114 | **NONE** |
| 412344 | 2019 | Freightliner | Walk In P1000 | 4UZAAPFD1KCKN9145 | ReadyCap |
| 412345 | 2019 | Freightliner | Walk In P1000 | 4UZAAPFD3KCKN9146 | ReadyCap |
| NA | 2018 | Service Truck | F550 | 1FD0W5HT0JEC21611 | **NONE** |
| NA | 2014 | Service Traier | Trailer | 55YBE1821EN002935 | **NONE** |

4. Pursuant to its liquidation strategy, the Debtor sought to employ Moecker Auctions, Inc. ("**Moecker**") to run an auction of the ReadyCap Vehicles.[1] The Debtor filed a Motion to Sell Property Free and Clear of All Liens, Claims and Encumbrances Pursuant to 11 U.S.C. § 363 (the "**Moecker Sale Motion**") (Doc. No. 47). Prior to the hearing on both the Debtor's Application to Employ and Compensate Moecker Auctions, Inc., ("**Moecker Application**") (Doc. No. 46) and Moecker Sale Motion, ReadyCap informally opposed the 15% fees and costs in the Moecker Application.[2]

5. While ReadyCap supported a sale of the Vehicles, it also insisted that the Debtor utilize ReadyCap's preferred auction company, The Hamilton Group ("**Hamilton**"). In an attempt to avoid incurring unnecessary litigation expenses and, believing it would lower the transaction costs of the contemplated sale, the Debtor agreed to withdraw the Moecker Sale Motion and Moecker Application and proceed with what the Debtor believed would be a less expensive proposal from Hamilton, ReadyCap's preferred auctioneer.

6. However, to the Debtor's surprise, not only did ReadyCap not have a concrete proposal from Hamilton, but Hamilton was seeking an even higher 25% commission for the sale of the Vehicles than what the Debtor had negotiated with Moecker.

7. Ultimately Hamilton agreed to reduce its rate to 15%, but while the Debtor waited for a revised proposal from Hamilton (which never came), the Debtor brought a list of private sale offers to ReadyCap.

8. During the course of the case, the Debtor filed three sale motions to sell to three private buyers.[3]

---

[1] The Vehicles indicating a lien in favor of ReadyCap are referred to as the "ReadyCap Vehicles."
[2] The Debtor was able to reduce the initial proposed fees to this amount.
[3] Emergency Motion for Sale of Assets Free and Clear of All Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. § 363 ("**Hutson Sale Motion**") (Doc. No. 88), Emergency Motion for (I) Sale of Assets Free and Clear of All Liens,

9. ReadyCap consented to each of the private sale offers the Debtor brought.

10. The Court entered orders approving each of the sales (Doc. Nos. 99. 100 and 111) collectively the "**Sale Orders**")[4] resulting in proceeds of $300,500.00 (the "**Sale Proceeds**"). See Doc. No. 227 and its Exhibit B.

11. In addition to coordination of the sales of the Vehicles, the Debtor expended considerable resources coordinating the transfer of titles to the purchasers of the Vehicles. Because the electronic titles for the Vehicles had a lien in favor of ReadyCap noted on them, the Debtor was not able to transfer title to the Vehicles unilaterally without the cooperation of ReadyCap, who first needed to release the lien on the electronic title. This coordination required additional research and discussions so that the Vehicle sales could be completed.

12. During the course of the case, the Debtor stored the Vehicles at two separate storage lots called "TruckSpot" (the "**Storage Lot**"). The Debtor obtained authorization to use cash collateral to pay monthly storage fees to ensure the Vehicles were protected until they were sold. See Doc. No. 87.

13. Prior to confirmation, on or about February 7, 2022, the Debtor drafted an agreed stay relief motion and an agreed order to give the remaining, unsold Vehicles to ReadyCap and avoid additional disputes over the matter. Ignoring the vanilla agreed drafts provided by the Debtor, a week later ReadyCap filed its own Motion for Stay Relief (Doc. No. 141, 144), which was ultimately denied as moot because the Debtor's confirmed plan provided for abandonment, as set forth below.

---

Claims, and Encumbrances Pursuant to 11 U.S.C. § 363 and (II) Approval of Post-Petition Financing Pursuant to 11 U.S.C. § 364 Effective as of October 22, 2021 ("**Nazir Sale Motion**"), and Emergency Motion for Sale of Assets Free and Clear of All Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. § 363 ("**McGee Sale Motion**") (Doc. No. 107).
[4] Doc. Nos. 99, 100 and 111.

14. On March 17, 2022, the Court entered its Order Confirming Debtor's Modified Amended Subchapter V Plan of Liquidation (Doc. No. 186). The confirmed Modified Amended Subchapter V Plan of Liquidation ("**Plan**") provided for the abandonment of the remaining unsold Vehicles to ReadyCap no later than March 31, 2022 (Doc. No. 181). Pursuant to the terms of the Plan, the Debtor abandoned the Vehicles to ReadyCap on March 18, 2022 (Doc. No. 197). However, ReadyCap failed to pick up the Vehicles from the Storage Lot, failed to take title to the Vehicles or otherwise assume responsibility for the abandoned Vehicles.

15. The Storage Lot inquired with the Debtor's counsel frequently about outstanding storage fees and threatened to tow the Vehicles if storage fees were not paid. The Debtor continued to negotiate with the Storage Lot to prevent the Vehicles from being towed to an unknown location, and to prevent the Storage Lot from imposing liens on the Vehicles for non-payment of storage fees and towing fees.[5]

16. Following confirmation, the Debtor repeatedly asked ReadyCap to take title to and responsibility for the abandoned Vehicles, without response.

17. Ultimately, with no other options and no response from ReadyCap, the Debtor was forced to file a Motion to Approve Modification of the Debtor's Plan (Doc. No. 225) to force ReadyCap to take the wheel. While the remaining Vehicles were ultimately abandoned, and no secured property is allocated to surcharge, the Debtor highlights these issues as additional lengths it had to go to throughout the case to protect and preserve ReadyCap's collateral.

18. The fees and costs expended by the Debtor to protect ReadyCap's collateral, as set forth in Composite Exhibit A, justify surcharge of the Sale Proceeds.[6]

---

[5] The Debtor paid storage fees through April but was subsequently out of funds and was unable to continue to pay these fees. They were paid with cash collateral.
[6] The Debtor reserves the right to seek additional surcharge on other assets preserved, protected and monetized by the Debtor, following the determination of the extent of ReadyCap's security interest, which dispute is still pending.

5

**Argument**

19.     Section 11 U.S.C. § 506(c) permits a debtor in possession to "recover from property securing an allowed secured claim, the reasonable, necessary costs, and expenses of preserving, or disposing of such property to the extent of any benefit to the holder of such claim." Surcharge applies "when the estate incurs expenses to liquidate collateral for the sole or primary benefit of a secured creditor, rather than the estate." *In re Toy King Distributors, Inc.*, 256 B.R. 1, 193 (Bankr. M.D. Fla. 2000). "The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the *general estate and unsecured creditors should not be required to bear the costs of protecting what is not theirs*." *In re Olympia Holding Corp.*, 127 B.R. 478, 481 (Bankr. M.D. Fla. 1991) (emphasis in original) (internal citation and quotations omitted).

20.     Generally, Courts will permit a surcharge where "the secured creditor expressly or impliedly consented to the expense." *In re Spa at Sunset Isles Condominium Ass'n, Inc.*, 454 B.R. 898, 908 (Bankr. S.D. Fla. 2011). Where the secured creditor has not consented to the expense, either explicitly or implicitly, a surcharge may still be imposed where: "(1) the expenditure was necessary; (2) the amount expended was reasonable; and (3) the creditor benefitted from the expenditure." *Id. See also Toy King Distributors*, 256 B.R. at 193 (the party seeking surcharge "must show that the costs incurred in preserving or administering the debtor's assets resulted in a quantifiable benefit to the creditor.").

21.     Here, ReadyCap consented to the expenses associated with the sale and preservation of the ReadyCap Vehicles. ReadyCap explicitly consented to the sales contemplated by the Hutson Sale Motion, Nazir Sale Motion, and McGee Sale Motion. As a result, ReadyCap

also tacitly consented to the expenses the Debtor incurred in procuring, approving, finalizing, and consummating each of the sales contemplated by the Hutson Motion, Nazir Motion, and McGee Motion.

22. To the extent ReadyCap did not explicitly consent to the expenses associated with sale of the Vehicles, surcharge of the Sale Proceeds is still warranted because the expenses were necessary, the amounts expended were reasonable, and the expenditures directly benefited ReadyCap.

23. After ReadyCap rejected the initial auction and sale process proposed by the Debtor, the Debtor incurred additional attorney fees to negotiate individual sales with private buyers, draft individual sale agreements, draft the Hutson Sale Motion, Nazir Sale Motion and McGee Sale Motion and coordinate with ReadyCap to ensure transfer of titles to the Vehicles. These expenses were necessary to liquidate the ReadyCap Vehicles. *See In re E.J. Management Group*, 72 B.R. 421, 423 (Bankr. M.D. Fla. 1987) (permitting a surcharge to pay for attorney's fees incurred in connection with a sale).

24. Even when the Debtor drafted papers and consented to stay relief, ReadyCap still refused to collect and protect its collateral. The sales of the Vehicles were necessary to liquidate the estate and cut off the expenses incurred in protecting the collateral.

25. The Debtor's efforts have directly benefited ReadyCap, who may be entitled to a portion of the sales proceeds resulting from the sales.

***The Expenditures Were Necessary***

26. ReadyCap never provided a modified proposal from Hamilton, it opposed an auction through Moecker, and it only sought stay relief weeks before confirmation. Without the

expenditures by the Debtor to protect the Vehicles in the interim, the Vehicles would not have been sold to willing buyers, and they would not have been sold as expeditiously.

27. The Debtor marketed the Vehicles through various sources, including other known FedEx contractors. The Debtor's resources facilitated the sales, and its attorneys drafted sales contracts, motions and orders to finalize the sales for the benefit of ReadyCap.

28. Further, it is undisputed that ReadyCap explicitly consented to each of the private sales resulting in the $300,500 in proceeds.

***The Amounts Expended were Reasonable***

29. The amounts expended by the Debtor in selling ReadyCap's collateral was reasonable. The Debtor expended a total of $37,225.50, or approximately 12% of the Sale Proceeds, in attorney's fees to assist with the sale and protection of the ReadyCap Vehicles. *See* Composite Exhibit A. Not only have such fees already been approved as reasonable in connection with approval of Underwood Murray's fees, but the costs associated with the sale are approximately equal to and no less burdensome than the fees an auctioneer would have charged. *See* Doc. No. 48, at Exhibit B (indicating Moecker would have received 13% of the sales price).

***ReadyCap Benefited from the Expenditures***

30. The Subchapter V trustee is holding $300,500 as a result of the Debtor's efforts, which ReadyCap claims a lien on. Importantly, ReadyCap avoided the uncertainty of an auction which could have garnered less than what was recovered through the sales. ReadyCap also avoided the fees and costs it would have incurred to seek alternative relief, or to auction the Vehicles sold through the Sale Orders.

31. Surcharge is appropriate because ReadyCap either implicitly consented to the necessary expenses related to the sales of the Vehicles, and because the Debtor has demonstrated

that even absent ReadyCap's explicit consent, the expenses incurred in protecting and disposing of the Vehicles for ReadyCap's benefit was necessary, reasonable, and beneficial to ReadyCap. Rather than burden the estate and unsecured creditors with the costs of protecting and disposing of the Vehicles, the Debtor is entitled to a surcharge equal to $37,225.50 under § 506(c) from the funds held by the Subchapter V trustee.

32.     Surcharge is appropriate to prevent a windfall to a creditor from efforts by the Debtor in preserving property belonging to the creditor and not the estate. *Olympia Holding*, 127 B.R. at 482 (also noting the Debtor need not allocate specific costs on a piece-by-piece basis).

WHEREFORE, the Debtor respectfully requests that the Court: (1) grant the Motion; (2) permit the Debtor to surcharge the Sale Proceeds in the amount of $37,225.50 for the necessary and reasonable expenses associated with the cost of selling and protecting the Vehicles; and (3) and grant such further relief as the Court deems to be just and proper.

Dated: July 5, 2022.

Respectfully submitted,

/s/ Megan W. Murray
Megan W. Murray
Florida Bar Number 0093922
Adam M. Gilbert
Florida Bar Number 1011637
UNDERWOOD MURRAY, P.A.
100 N. Tampa St., Suite 2325
Tampa, FL 33602
Tel: (813) 540-8401 / Fax: (813) 553-5345
Email:  mmurray@underwoodmurray.com
             agilbert@underwoodmurray.com
*Counsel to the Debtor*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing, that was filed with the Clerk of Court, has been furnished electronically to those parties registered to receive service via CM/ECF, on July 5, 2022, including the United States Trustee, who is registered to receive electronic notices in this case.

/s/ Megan W. Murray
Megan W. Murray, Esq.